John A. DAVIS, Indiv. and on behalf of all others similarly situated, et al., Plaintiffs,

v.

Paul WATKINS, Indiv. and in official capacity, et al., Defendants.

No. C 73-205.

United States District Court, N. D. Ohio, W. D.

Sept. 9, 1974.

Gerald B. Lackey, Toledo, Ohio, and C. Thomas McCarter, Joseph F. Vargyas, John C. Lamb and R. Michael Frank, A.B.L.E., Toledo, Ohio, for plaintiffs.

William T. Brown, Atty. Gen., Andrew J. Ruzicho, Barbara Rouse, Richard B. Igo, Asst. Attys. Gen., Columbus, Ohio, John Czarnecki, Toledo, Ohio, for defendants.

J. Stanley Pottinger, Asst. Atty. Gen., Michael S. Lottman and Michelle C. White, Attys., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, for the United States, amicus curiae.

## ORDER

WALINSKI, District Judge.

This cause came to be heard on joint oral motions for partial summary judgment pursuant to Rule 56(e), Federal Rules of Civil Procedure, and on a motion *sua sponte* for partial judgment following a hearing before the Court on August 26, 1974, through August 30, 1974. Brought as a class action, this suit seeks to secure, for those patients, present and future, of Lima State Hospital, the so-called Right-to-Treatment. The defendants have admitted, in their answer, that such a right exists and have called upon the Court to define its parameters within this factual setting.

Although the Court intends to issue a further order supplementing this one in which that bundle of Constitutional rights guaranteed to involuntary mental patients will be more extensively discussed, it should be sufficient at this juncture to indicate that it agrees with the parties that the State, upon committing an individual "until he regains his sanity", incurs a responsibility to provide such care as is reasonably calculated to achieve that goal. The Court has carefully studied the opinion of Judge Johnson in Wyatt v. Stickney, 344 F.Supp. 373, 344 F.Supp. 387 (M.D.Ala.1972), 325 F.Supp. 781 (M.D.Ala.1971 [appeal pending 5th Cir.]), and agrees almost totally with the reasoning of that case and the remedies announced therein. Many of these paragraphs have been excerpted verbatim from that opinion.

The subsequent Order referred to above will deal with the twenty-three (23) issues outlined in the Court's Order of August 20, 1974, as reserved for trial as well as general conclusions of law and findings of fact.

The Court would like to take this opportunity to commend the attorneys who participated in this action. Although conducted in the true adversary manner, these proceedings were marked with the spirit of cooperation and full disclosure contemplated by the Federal Rules of Civil Procedure. It is almost inconceivable that a case of this complexity, yielding literally reams of discovery, stipulations of fact running to some one hundred and thirty-five pages, as well as countless legal memoranda could have been completed, from the date of filing to the completion of trial, in less than sixteen months.

Although everyone who participated in this action deserves commendation, the Court would like particularly to point out the contribution of Advocates for Basic Legal Equality, a local legal services group. They entered the action upon a simple letter of request from the Court, at a point at which it had become apparent that it was not humanly possible for the private attorney, originally appointed, to single-handedly

maintain this cause without sacrificing his entire practice. They entered with no hope or promise of compensation and pointedly reemphasized, by their ability and diligence, the very real benefit such groups can afford the communities in which they operate. The private bar, however well-intentioned, cannot be expected to bring to bear the massive amounts of sophisticated legal manpower necessary to pursue an action such as this.

The attitude and performance of the public officials involved herein likewise deserve mention. Both the offices of Governor John Gilligan and Ohio Attorney General William Brown were extremely cooperative in providing the Court with the volumes of research data and alternative proposals so helpful in reaching a decision herein.

It therefore appearing to the Court that the press of time requires at least an interim Order at this time and the evidence adduced allows the following, it is

Ordered that the defendants immediately implement a program at Lima State Hospital that complies with the attached Appendix A, Pages 1 through 32, of this Order.

## APPENDIX A

### I. DEFINITIONS AND OCCUPATIONAL GUIDELINES

For purposes of this Order, the Court will adopt and use the following definitions:

1) Institution—Lima State Hospital.

2) Patient or Resident—All persons who are now confined and persons who may in the future be confined at Lima State Hospital.

3(A) Qualified Mental Health Professional shall include the following:

a. A unit director shall be a psychiatrist who is Board Certified in the field of psychiatry with four (4) years in mental health administration or who has a master's degree in hospital administration and four (4) years experience in the administration of a mental hospital.

b. A psychiatrist shall be a physician licensed to practice medicine by the State of Ohio with three (3) years of residency training in psychiatry.

c. A social worker shall have a master's degree in social work (M.S.W.) from an accredited university and meet the minimum requirements for certification by the Academy of Certified Social Workers and two (2) years clinical experience in the treatment of mentally ill individuals under the supervision of a qualified mental health professional.

d. A registered nurse shall be so licensed by the State of Ohio and have at least two (2) years of clinical experience in the treatment of mentally ill individuals under the supervision of a qualified mental health professional.

e. Consultant shall mean an individual who possesses the qualifications for a qualified mental health professional, *supra,* depending on his or her profession.

(In addition to any qualifications set out in "a" through "e" above, anyone qualifying as a "qualified mental health professional" must demonstrate a sufficient degree of proficiency in the English language so that they are able to communicate effectively with patients.)

3(B) Non Professional Staff Member shall be those employees, including "psychiatric technicians" and others, who do not meet the requirements of a qualified mental health professional, yet whose duties require patient contact as an integral part of their employment at Lima State Hospital.

a. A physician shall be licensed to practice medicine in the State of Ohio.

b. An educational counsellor shall be so certified by the State of Ohio having graduated with a bachelor's degree with a major in the area in which they are teaching.

3(C) Support Personnel shall include those staff members whose duties do not require direct care of patients (maintenance, etc.).

3(D) Pharmacists shall perform duties which include, but are not limited, to the following:

    a. Receiving the original, or direct copy of the physician's drug treatment order.

    b. Reviewing the drug regimen, and any changes for potentially adverse reactions, allergies, interactions, contraindications, rationality, and laboratory test modifications and advising the physician of any recommended changes, with reasons and with an alternate drug regimen.

    c. Maintaining for each resident an individual record of all medication (prescription and nonprescription), including quantities and frequencies of refills.

    d. . Participating in the continuing interdisciplinary evaluation of individual residents for the purposes of initiation, monitoring, and follow-up of individualized habilitation program.

    e. Labelling each medication vial with the name of the patient, the drug and dosage.

■ 4) Evaluation team means those persons commissioned by the Ohio Department of Mental Health and Mental Retardation to evaluate the mental condition and need for further confinement and treatment of the patients committed to Lima State Hospital. There shall be at least three (3) evaluation teams composed of at least three (3) persons, of whom one must be a Board Certified psychiatrist, or at least Board Eligible. Other members of the team may be a clinical psychologist with at least a Ph.D in psychology or a social worker with at least a M.S.W. degree. The Department shall have the discretion to appoint the team within those guidelines. The Department shall make reasonable efforts to appoint individuals to the team who are not employed by the Department of Mental Health and Mental Retardation. After selection of the teams by the Department, any party may object in writing to the selection of any member of the team by filing a motion in Court setting forth the reasons for each objection. In the event parties cannot agree upon individuals to comprise the teams, the parties shall submit a list of names, together with appropriate data on each to the Court, within fifteen (15) days from the date of this Order, and the Court shall hold a hearing to designate the individuals to comprise each team.

■ 5) Hearing, unless otherwise indicated, means a proceeding to determine whether an individual is:

    a. Mentally ill or mentally retarded, and

    b. That there is an extreme likelihood that if the individual is not confined he will do immediate harm to himself or to others, and

    c. In need of placement in a maximum security psychiatric facility as defined *infra*.

Such determination shall be made beyond a reasonable doubt and the burden of proof shall be upon the person, agency or officials seeking commitment. The individual involved shall be given notice and an opportunity to be heard, and shall have the right to be represented by plaintiffs' counsel or their designee if the individual is unable to afford counsel.

6) In need of placement in a maximum security psychiatric facility means an individual likely, as evidenced by recent and past history of overt acts, to do immediate harm to others so that confinement in other existing civil (or where appropriate correctional) facilities is not feasible to ensure the safety of others.

7) "Maximum security psychiatric facility", whenever used herein, shall mean Lima State Hospital or any other institution established by the State of Ohio to carry on the functions of that facility.

8) "Ascherman", when used within this Order, (i. e., Ascherman Act, Ascherman commitment, Ascherman facility) shall mean those patients committed to Lima State Hospital pursuant to § 2947.-24 et seq. or the facility used to house such patients.

## II.

The present population of Lima State Hospital shall be individually evaluated pursuant to the following programs. Such evaluations shall be commenced on September 15, 1974, and completed in compliance with the inplementation schedule established in this Order.

A. *Persons Committed While on Parole or After Criminal Conviction; Persons Retained Beyond Maximum Criminal Sentence.*

1) Each person, who on the date of this Order is a patient at Lima State Hospital, having been committed pursuant to §§ 2967.22, 5125.04, or 5125.08 and 5125.09 of the Ohio Revised Code, shall be evaluated by an evaluation team to determine whether he or she is:

a. Mentally ill or mentally retarded; and

b. That there is an extreme likelihood that if the individual is not confined he/she will do immediate harm to him/herself or others.

2) A report of the teams' finding with respect to each patient shall issue within fourteen (14) days from the commencement of the evaluation procedure, and a copy of said report shall be forwarded to all parties to this action, and to the patient, to his or her attorney, and (if the patient should request) to his or her spouse, parent, or guardian. (Hereinafter, whenever this Order requires that a copy of any report prepared regarding a patient's present mental condition be given that patient, such a requirement is expressly waived in cases in which the evaluation team deems such notice to be psychologically inappropriate, by making such a reservation upon the report.)

3) Unless the team finds that the patient is both mentally ill or retarded and dangerous, as defined in ¶¶ 1(a) and (b), *supra*, the patient shall be released pursuant to appropriate procedures.

4) If the patient is found by the team to be both mentally ill or retarded and dangerous, as defined in ¶¶ 1(a) and (b), *supra*, the defendants shall notify the appropriate state or local authorities forthwith. Such officials shall determine whether further hospitalization is necessary.

5) Notice of determinations that patients should be further hospitalized shall be served within five (5) days of the notifications referred to in ¶ 4 above, upon the patient, his or her attorney, his or her spouse, parent or guardian and the Master assigned by this Court to conduct a hearing to determine the disposition of such patients.

6) The Master shall hold a hearing forthwith as to the disposition of the patient sought to be hospitalized, unless a reasonable delay is sought by any party.

7) The Master shall issue a decision forthwith ordering either that the patient be released or that the patient be transferred within 21 days to an appropriate mental health or mental retardation facility within a reasonable distance of the patient's home.

B. *Direct Civil Commitments; Transfers from Civil Institutions*

1) Each person who on the date of this Order is a patient at Lima State Hospital, having been committed pursuant to §§ 5122.06 through 5122.15 and 5125.03, Ohio Revised Code, shall be evaluated by an evaluation team to determine whether or not he or she is:

a. Mentally ill or mentally retarded; and

b. That there is an extreme likelihood that if he/she is not confined he/she will do immediate harm to him/herself or others; or

c. Mentally ill or retarded and in need of placement in a maximum security psychiatric facility.

2) A report of the teams' findings with respect to each patient shall issue within sixty (60) days from the commencement of the evaluation procedures, and a copy of said report shall be forwarded to all parties to this action, and to the patient, his or her attorney, his or her spouse, parents or guardian.

3) Unless the team finds that the patient is mentally ill or retarded and dangerous, or mentally ill or retarded and in need of placement in a maximum security psychiatric facility, as defined *supra,* those patients committed to Lima State Hospital pursuant to §§ 5122.06 through 5122.15 of the Ohio Revised Code shall be released forthwith. All other patients shall be returned within 21 days of such determination to the parent institution from which they were transferred to Lima State Hospital with the recommendation of the Superintendent of the Lima State Hospital and the Director of the Department of Mental Health and Mental Retardation that they be released forthwith.

4) If the patient is found by the team to be both mentally ill or retarded and dangerous, as defined in ¶¶ 1(a) and (b), *supra,* the patient shall be transferred within 21 days of such determination to an appropriate mental health or mental retardation facility within a reasonable distance of his or her home.

5) If the patient is found by the team to be mentally ill or retarded, and in need of a maximum security hospital, the patient shall be retained at Lima State Hospital unless otherwise ordered by the Master. Notice of such determination that patient should be further retained at Lima State Hospital shall be served within five (5) days of the decision to retain such patient, upon the patient, his or her attorney, his or her spouse, parent or guardian and the Master assigned by this Court to conduct the hearing to determine the disposition of such patients. After the notification, the Master shall hold a hearing forthwith as to the disposition of the patients sought to be hospitalized, unless a reasonable delay is sought by any party. The Master shall issue a decision forthwith ordering either that the patient be retained at Lima State Hospital, transferred to an appropriate mental health facility within a reasonable distance of his or her home, or released pursuant to appropriate procedures.

### C. Ascherman Act Commitments.

1) Each person who on the date of this Order is a patient at Lima State Hospital, having been committed pursuant to §§ 2947.24 and 2947.25, Ohio Revised Code, shall be evaluated by an evaluation team to determine whether the individual is subject to continued commitment under validly recognized legal and medical standards.

2) The report of the teams' findings with respect to each patient shall issue within 120 days from the commencement of the evaluation procedure, and a copy of said report shall be forwarded to all parties to this action, the patient, his or her attorney, and his or her spouse, parents or guardian. With respect to persons committed to Lima State Hospital for observation pursuant to § 2947.25 of the Ohio Revised Code for whom no report has been submitted to the committing court and a decision is pending in said court, the report required herein shall serve as the report required by § 2947.25, Ohio Revised Code. For such person for whom a report has already been submitted to the committing court pursuant to § 2947.25, Ohio Revised Code, and a decision is pending in said court, a copy of the report herein shall also be submitted to said court.

3) With respect to such patients, unless the patient is found by the team to be subject to continued commitment under validly recognized legal and medical standards, the Superintendent of Lima State Hospital shall report to the coordinator of forensic psychiatry that the patient has recovered, or that his or her condition has improved to such an extent that he or she no longer needs the special custody, care, or treatment provided by Lima State Hospital. The defendant shall cause the coordinator of forensic psychiatry to certify said report to the committing court for probation or sentencing proceedings pursuant to § 2947.27, Ohio Revised Code, and to issue an appropriate order terminating the patient's indefinite commitment to the

Department of Mental Health and Mental Retardation.

### D. Transfers from Penal Institutions.

1) Each person, who on the date of this Order is a patient at Lima State Hospital, having been committed pursuant to §§ 5120.14 or 5125.05 of the Ohio Revised Code shall be evaluated by an evaluation team to determine whether the individual is mentally ill or retarded and in need of placement in a maximum security psychiatric facility.

2) A report of the teams' findings with respect to each patient shall issue within 120 days from the commencement of the evaluation procedure, and a copy of said report shall be forwarded to all parties to this action, the patient, his or her attorney, and his or her spouse, parents or guardian.

3) Unless the team finds that the patient is mentally ill or retarded and in need of placement in a maximum security psychiatric facility, supra, such patient shall be transferred back to the parent correctional facility within 21 days.

4) If a patient is found to be mentally ill and in need of placement in a maximum security psychiatric facility, he or she shall remain at Lima State Hospital.

### E. Persons Found Incompetent to Stand Trial.

1) Each person who on the date of this Order is a patient at Lima State Hospital, having been committed pursuant to §§ 2945.37 and 2945.38, Ohio Revised Code, shall be evaluated by the evaluation team to determine whether he or she is able to understand the charges against him or her and can cooperate with his or her counsel in the preparation of defense of such charges, and whether within the foreseeable future he or she is likely to regain the requisite competency to stand trial.

2) A report of the teams' findings with respect to each patient shall issue within 120 days from the commencement of the evaluation procedure, and a copy of said report shall be forwarded to all parties to this action, and to the patient, his or her attorney, and his or her spouse, parents or guardian.

3) If the team finds the patient is of sufficient soundness of mind to understand and appreciate the nature and consequences of the charges against him, to comprehend his situation, and is mentally capable of furnishing his counsel with facts essential to the presentation of a proper defense, the patient shall be returned to the committing court forthwith. All other patients shall be provided rights set forth in the executive order (G–22) promulgated by the Director of the Department of Mental Health and Mental Retardation on August 23, 1974. (Attached hereto as Exhibit 1.)

### F. Persons Found Not Guilty by Reason of Insanity.

1) Each person who on the date of this Order is a patient at Lima State Hospital, having been committed pursuant to § 2945.39, Ohio Revised Code, shall be evaluated by the evaluation team to determine whether he or she is:

   a. Mentally ill or mentally retarded; and

   b. That there is an extreme likelihood that if the individual is not confined he/she will do immediate harm to him/herself or others.

2) A report of the teams' findings with respect to each patient shall issue within thirty (30) days from the commencement of the evaluation procedure, and a copy of said report shall be forwarded to all parties to this action.

3) If the team finds that the patient is neither mentally ill or retarded nor dangerous, as defined in ¶¶ 1(a) and (b), supra, the Superintendent of Lima State Hospital shall designate a member of the evaluation team as the alienist required in the release proceedings under § 2945.39, Ohio Revised Code, and the Superintendent and the alienist shall be bound by the findings of the evaluation team in their determination as to the patient's sanity and dangerousness

in such release proceedings. Such proceedings shall be initiated forthwith with respect to the patients described in this paragraph.

Nothing in this Order shall affect any issue that is before the three-judge district Court.

III. MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE TREATMENT FOR PATIENTS COMMITTED TO LIMA STATE HOSPITAL

A. *Placement of Patients in the Least Restrictive Setting.*

■ 1) The defendants shall place all persons admitted to the Department of Mental Health and Mental Retardation in the Least Restrictive Confinement, which means the minimum limitation of movement or activity of a patient or resident necessary to provide reasonable assurance that his dangerousness would not constitute a significant risk to others and in which treatment or habilitation continues to the fullest extent possible.

B. *Individualized Treatment Plans.*

■ 1) Each patient shall have a comprehensive physical and mental examination and a review of behavioral status by an appropriate specialist to determine if his admission is appropriate within 72 hours after admission to the hospital.

2) Each patient shall have an initial individualized treatment plan. The plan shall be developed by appropriate qualified mental health professionals, including his ward psychiatrist, and implemented as soon as possible, but in no event later than three (3) to five (5) days after the patient's admission. Thereafter, each patient shall have a final individualized treatment plan which shall be developed and implemented within fourteen (14) days of the patient's admission. Each final treatment plan shall contain:

a. A statement of the nature of the specific limitations and abilities, specific problems, and specific needs of the patient.

b. A statement of the patient's current mental status and the least restrictive treatment conditions necessary to achieve the treatment purposes of his commitment.

c. The name and title of the qualified mental health professionals who are members of the patient's treatment team.

d. A statement and rationale for the plan of treatment for achieving these intermediate and long-range goals.

e. A description of intermediate and long-range treatment goals, with a projected timetable for their attainment.

f. Criteria for release to less restrictive setting for habilitation, including criteria for discharge and a projected date for discharge with a post-discharge treatment program.

g. The name of the mental health professional responsible for implementation and monitoring of the initial and final individualized treatment plan.

h. A notation of any therapeutic tasks to be performed by the patient.

3) The treatment plan shall be continuously reviewed by the treatment team responsible for the patient's individualized treatment plan. The treatment team shall evaluate the patient's treatment program with respect to the validity of the present course of treatment and his need for a maximum security psychiatric facility. An estimated time for release shall be determined at each such review and made part of his or her record. This review shall not be less than once a week for the first month, once a month for the first ninety (90) days, and then at least every ninety (90) days thereafter. A report of all such reviews shall be placed in the patient's medical files and sent to his or her attorney, and his or her spouse, parents or guardian.

4) In the interest of continuity of care, one qualified mental health professional shall be responsible for supervising the implementation of the treatment plan, integrating the various aspects of the treatment program and recording the patient's progress, as measured by objective indicators. This qualified mental health professional shall also be responsible for insuring that the patient is released when appropriate into a less restrictive rehabilitative setting.

5) In addition to treatment for mental disorders, patients confined to Lima State Hospital are also entitled to and shall receive appropriate treatment for physical illnesses. In providing such medical care, the defendants shall establish a preventive medical evaluation program and the hospital shall take advantage of whatever community-based facilities are appropriate and available for the cure and treatment of patient's physical disorders and shall coordinate the patient's treatment for mental illness with his medical treatment. If community-based facilities do not have the equipment or appropriate resources available to treat the patient's medical disorder, the Department of Mental Health and Mental Retardation shall transfer such person to the nearest appropriate institution.

6) Complete records of each patient shall be maintained on the ward in which the patient is placed and shall be available to qualified mental health professionals and to non-professional staff who are directly involved with the particular patient. All information contained in a resident's records shall be considered privileged and confidential, and shall be available to anyone properly authorized in writing by the patient to review such records, including the patient, his or her attorney, and his or her spouse, parents or guardian. These records shall include:

a. Identification data, including the patient's legal status.

b. Patient's history, including but not limited to: (1) family data, educational background, and employment record; (2) prior medical history, both physical and mental, including prior hospitalization or institutionalization.

c. The chief complaints of the patient, and the chief complaints of others regarding the patient.

d. An inventory of the patient's life skills.

e. An evaluation which notes the onset of illness, the circumstances leading to admission, attitudes, behavior, estimate of intellectual functioning, memory functioning, orientation, and an inventory of the patient's abilities in non-interpretative fashion.

f. Carry a record of each physical examination which describes the results of the examination.

g. A copy of the individual habilitation plan and any modifications thereto, and an appropriate summary which will guide and assist the non-professional staff in implementing the residents' program.

h. A detailed summary of the findings made by the reviewing qualified mental health professional after each periodic review of the treatment plan, and detailed summaries of the findings of the reviewing staff, including the findings of the independent mental health professional, after each periodic review which analyzes the successes and failures of the treatment program and directs whatever modifications are necessary.

i. A copy of the post-institutionalization plan and any modifications thereto, and a summary of the steps that have been taken to implement the plan.

j. A medication history and status, which includes the signed orders of prescribing physicians. Nurses shall indicate by signature that orders have been carried out.

k. A detailed summary of each significant contact by mental health professionals with the patients.

*l.* A detailed summary on at least a weekly basis by a qualified mental health professional involved in the patient's treatment on the patient's progress along the treatment plan.

*m.* A monthly summary of the extent and nature of the resident's work activities and educational and vocational activities and the effect of such activities upon the resident's progress along habilitation plans.

*n.* A signed order by a qualified mental health professional for any physical restraints and isolation, in accordance with the procedure set forth below.

*o.* A detailed summary of any extraordinary incident in the hospital involving the patient to be entered by a staff member noting that he has personal knowledge of the incident by specifying his other source of information, and initialed within 24 hours by a qualified mental health professional, included in the reports of investigation of resident mistreatment.

*p.* A summary of family visits and contact.

*q.* A summary of attendance and leaves from the institution.

*r.* A record of any seizures, illnesses, treatments, immunizations.

*s.* The identity of the author of all entries made into a patient's medical records should be made by the use of a mental health professional identity ledger. Symbols, initials, and abbreviations used in a patient's medical records file may be done only after approval by the medical staff and when there is an explanatory ledger available.

*t.* A summary by the Superintendent of the hospital or his appointed agent of his findings after the fifteen (15) day review which is set forth more fully in ¶ 8, *infra.*

7) In addition to complying with all of the standards herein, the hospital shall make special provision for the treatment of patients who are juveniles or young adults. These provisions shall include but are not limited to:

a. Segregation from the adult population of the institution.

b. Opportunities for publicly supported education suitable to the educational needs of the patient.

c. A treatment plan which considers the chronological, nutritional, and developmental level of the patient.

d. Sufficient qualified mental health professionals, teachers, and staff members with specialized skills in the care and treatment of children or young adults to effectively implement such programs.

e. Recreation and play opportunities in the open air where possible, and appropriate residential facilities.

f. Arrangements for contact between the hospital and the family of the patient.

8) No later than fifteen (15) days after a patient is committed to the hospital, the Superintendent of the hospital or his appointed professionally qualified agent shall examine the patient and shall determine whether the patient continues to require hospitalization and whether a treatment plan comporting with requirements of this section has been implemented. If the patient, in his opinion, no longer requires hospitalization, or if a treatment plan has not been implemented, he must return the patient to the committing court, transfer the patient to a less restrictive facility within the Department, institute appropriate commitment procedures, or release the patient from the institution.

9) The Department of Mental Health and Mental Retardation and its agents have an affirmative duty to provide adequate transitional treatment and care for all patients released after a period of confinement to Lima State Hospital. Transitional care and treatment possibilities include, but are not limited to, psychiatric day care, treatment in the home by a visiting therapist, nursing home or extended care, out-patient

treatment, and treatment in psychiatric ward of a general hospital.

10) The Superintendent of the hospital shall report in writing to the next of kin or guardian of the patient at least every six (6) months on the patient's progress towards his eventual habilitation. Such report shall also state any appropriate habilitation program which has not been afforded to the resident because of inadequate habilitation resources. This report may be the most recent entry into the patient's medical records as set forth in ¶ 6(h), *supra*.

### C. Treatment of Patients in the Most Humane Psychological and Physical Environment.

1) The patient shall have a right to dignity, privacy and humane care.

2) Patients shall have a right to the least restrictive conditions necessary to achieve the purposes of their commitment in accordance with their individual treatment plan.

3) Residents shall lose none of the rights enjoyed by citizens of Ohio and of the United States solely by reason of their admission or commitment to the institution, except as expressly determined by an appropriate court.

4) No person shall be deemed incompetent to manage his affairs, to contract, to hold professional and occupational or vehicle operators licenses, to marry and obtain a divorce, to register and to vote, or to make a will solely by reason of his commitment or admission to the hospital.

5) The institution shall provide, under appropriate supervision, suitable opportunities for the residents' interaction with members of the opposite sex, including the right to furlough visit, except where a qualified mental health professional responsible for the formulation of a particular resident habilitation plan writes an order to the contrary and explains the reasons therefor.

6) The opportunity for religious worship shall be accorded to each resident who desires such worship. Provisions for religious worship shall be made available to all residents on a non-discriminatory basis. No individual shall be coerced into engaging in such religious activities.

7) The institution shall prohibit corporal punishment, mistreatment, neglect or abuse in any form of any patient. Any alleged violation shall be reported immediately to the Ombudsman and the Superintendent, and there shall be a written record that:

a. Each violation has been thoroughly investigated by the Ombudsman and findings have been submitted to the Superintendent, the Director of the Department of Mental Health and Mental Retardation, and appropriate law enforcement agency within the community.

b. The result of such investigations are to be reported to the Superintendent, and to the Director of the Department of Mental Health and Mental Retardation within 24 hours of the report of such incident. Such reports are to be also sent to the local law enforcement officer within the community.

c. Appropriate action may be taken by the Superintendent, Director and law enforcement agency under the laws of the State of Ohio, including Departmental regulations.

d. The institution shall cause a written statement of this policy to be posted in each cottage and building and circulated to all staff members.

8) With respect to moderately, severely, and profoundly mentally retarded persons who have been committed to the institution, the institution shall provide treatment in accordance with the standards set forth by the Court in Wyatt v. Stickney, Appendix A, 344 F. Supp. 387 (N.D.Ala.1972) (excluding ¶ 41 of that order) (a copy of Appendix A is attached hereto and incorporated into this Order). If the hospital is unable to provide treatment to such patients in accordance with these standards, they shall be transferred forth-

with according to the Department regulations and state law to an appropriate facility providing the least restrictive setting to assure the patient's habilitation, which include the implementation of the principal of normalization along with community resources within the Division of Mental Retardation. Those residents who are borderline or mildly mentally retarded may remain in the institution provided they receive suitable educational services regardless of chronological age, the degree of their retardation, or accompanying disabilities or handicaps. To this extent, the institution shall formulate a written statement of educational objectives that is consistent with this goal and with the principal of normalization. School age residents shall be provided a full and suitable educational program, including in those instances where, in the opinion of the attending psychiatrist, it would be beneficial for the patient, they shall be permitted to attend public schools in the area. Educational programs provided for borderline or mildly retarded patients at the institution shall have a class size of no more than twelve (12) individuals, the classes shall be maintained for nine (9) to ten (10) months each year, and the classes shall be in session at least six (6) hours a school day. These classes shall be taught by an educator with a master's degree in special education from an accredited program.

9) A patient at Lima State Hospital shall have a right to receive prompt and adequate medical treatment for a physical ailment and for the prevention of any illnesses or disability. Such medical treatment shall meet standards of the medical practice of the community. A physician must be available at the institution or on call at all times. Every entering patient must be given a thorough and complete medical examination before being assigned to a ward. Thereafter, each patient must be given a medical examination every year. There must be a daily sick call attended by a licensed physician who shall make rounds to each ward in the institution. Within 180 days from the filing of this Order, the hospital shall improve its existing physical facilities to provide the following:

a. Ample and adequate rooms and equipment for conducting physical examination of patients.

b. Ample and adequate rooms and equipment for the treatment of medical emergencies, and minor injuries and illnesses.

c. Orders for patients who are too ill to remain safely as part of the general population of the institution, but not sufficiently ill to require hospitalization.

d. Adequate facilities for dental examinations and treatment, both curative and preventative.

10) Patients shall be entitled to send and receive sealed mail in accordance with the following standard:

a. There shall be no given time set for when patients must write their outgoing mail; this privilege for communication should be available to the patient at all reasonable times and the patient should be afforded ample privacy in which he can adequately communicate his thoughts.

b. Proper arrangements shall be made to ensure that all patients may freely obtain writing materials and postage from the commissary, and indigent patients shall be furnished at public expense, writing materials and ordinary postage for their personal use in dispatching a maximum of five (5) letters per week.

11) Patients at the hospital shall have the right to make telephone communication with persons outside the institution pursuant to orderly procedures set up by the mental health professionals on each ward upon the following conditions:

a. Provisions shall be made for as many telephone calls as are necessary for a person who is without counsel to obtain counsel; this shall be done at the patient's expense unless a

qualified mental health professional approves the telephone call at public expense.

b. Provisions shall be made for patients to make local calls during stated hours at no charge.

c. Provisions shall be made for patients to make long distance phone calls during stated hours, the cost to be borne by the patient, except in those instances where the individual is indigent, and the patient's treatment team authorizes such a call.

d. Patients' telephone calls shall not be monitored. Patients' right to communication shall not be prohibited except to the extent that the qualified mental health professional responsible for the formulation of the patient's treatment plan writes an order imposing special restrictions and explains the reasons for any such restrictions. This written order must be renewed every thirty (30) days if any restrictions are to be continued.

12) Patients in the hospital shall have unrestricted right to visitation, at all reasonable times, including the right to visit with their own children, except to the extent that the attending qualified mental health professional responsible for formulation of a particular patient's treatment plan writes an order imposing special restrictions on visitation and explains the reason for such restriction. This order must be renewed every thirty (30) days if any restrictions are to be continued.

13) There shall be no censorship of books or periodicals including newspapers supplied to, purchased by, or given to patients of the institution, and this would include books or magazines available through the library, except to the extent that the qualified mental health professsional responsible for formulation of a particular patient's treatment plan writes an order imposing special restrictions on the use of reading matter. This order must be in writing and renewed every thirty (30) days if the restrictions are to be continued. No security personnel shall be involved in the review or censorship of reading material. Patients shall have access to legal materials including a complete, updated set of the Ohio Revised Code.

14) Patients have a right to regular physical exercise daily. It shall be the duty of the institution to provide both indoor and outdoor facilities and equipment for such exercise.

15) No patient worker or patient shall administer drugs or perform such tasks as giving enemas, taking temperatures, inserting or replacing catheters, restraining or secluding patients, or any other function normally performed by medically trained individuals to fellow patients.

### D. Patients' Rights.

1) Patients shall have access to members of their treatment team, the Ombudsman and the Superintendent at all reasonable times and places, and patients shall not be required to obtain special permission to meet with or talk with said individuals during periods when their time is not otherwise scheduled.

2) Patients shall be provided counselling or other treatment for homosexuality, and defendants shall provide adequate and appropriate protection for patients subject to homosexual or other assaults by other patients. The qualified mental health professional is authorized to take appropriate steps to effect the policy of this subsection.

3) Patients shall not be required to remain silent for long periods when such silence is not reasonably necessary to the orderly operation of a particular program such as academic and vocational classes. Nor shall patients be required to remain in assigned seats or assigned areas of the ward for long periods of the day.

4) Repetitive, nonfunctional, degrading, and unnecessary tasks (so-called "make work") such as buffing a waxed floor that has already been sufficiently buffed, polishing brass, or shining em-

ployees' shoes shall not be required of patients under any circumstances.

### E. Patients' Personal Possessions.

1) Each resident shall have an adequate allowance of neat, clean, suitably fitting and seasonable clothing.

2) Each patient shall have his own clothing, which is properly and inconspicuously marked with his name, and he shall be kept dressed in this clothing. The hospital has an obligation to supply an adequate allowance of clothing to any patient who does not have suitable clothing of his own. Residents shall have the opportunity to select from various types of neat, clean, and seasonable clothing. Such clothing shall be considered the resident's throughout his stay in the hospital.

3) Clothing both in amount and type shall make it possible for patients to go out-of-doors in inclement weather, to go for trips or visits appropriately dressed, and to make normal appearances in the community.

4) Non-ambulatory residents shall be dressed daily in their own clothing, including shoes, unless contraindicated in written medical orders.

5) Washable clothing may be designed for multiple handicapped patients being trained in self-help skills in accordance with individual needs.

6) Clothing for incontinent patients shall be designed to foster comfortable sitting, crawling, and/or walking, and toilet training.

7) A current inventory shall be kept of each patient's personal clothing items.

8) The institution shall make provisions for the adequate and regular laundering of residents' clothing.

9) Whenever possible, and unless contraindicated by medical orders, patients should be afforded the opportunity to buy their clothes and personal property at local community centers.

10) Each patient shall have the right to keep and use his own personal possessions except if it was determined that such clothes or personal possessions may be determined to be dangerous, either to himself or others by a qualified mental health professional.

11) Each resident shall be assisted in learning normal grooming practices with individual toilet articles, including soap and toothpaste that are available to each patient.

12) Teeth shall be brushed daily with an effective dentifrice. Individual brushes shall be properly marked, and used and stored along with the patient's other personal possessions.

13) If desired by the patient, he or she shall have a shower or tub bath at least daily, and such facilities shall be available to the patient whenever such facilities are reasonably necessary for his personal hygiene. Showers shall be given when deemed medically appropriate.

14) Patient shall have the opportunity to be scheduled for hair cutting and styling, in an individualized manner, by trained personnel.

15) For residents who require such assistance, cutting of toe nails and fingernails, shall be scheduled at regular intervals.

16) Patients shall be allowed privacy and solitude in their own rooms whenever they desire, unless otherwise determined by a qualified mental health professional or unless such privacy would interfere with the patient's participation in a treatment program in which he is enrolled.

### F. Diet and Food Services.

1) A nourishing, well-balanced diet shall be provided to each patient.

2) The patients' diet shall provide a minimum of the recommended daily dietary allowance as developed by the National Academy of Sciences. Menus shall be satisfying and shall provide the recommended daily dietary allowances. In developing such menus, the institution shall utilize the modern cost food plan of the United States Department of Agriculture. The institution shall not

spend less per person for raw food, including the value of donated food, than the most recent per person cost of the moderate cost food plan for the midwest region of the United States, as compiled by the United States Department of Agriculture, for appropriate groupings of residents, discount of any savings which might result from the institutional procurement of such food.

3) Patients, except for the non-ambulatory, shall eat or be fed in dining rooms.

4) Provisions shall be made for special therapeutic diets and for substitutes at the request of the patient, or his guardian or next of kin in accordance with the religious requirements of any resident's faith.

5) The diet manual should be approved by the medical staff of the institution. There should be written policies and procedures relating to the safety and sanitation of the services, preparation and handling of the food, the care and cleaning of equipment and work areas, including the washing of dishes in the hospital. To this extent, the serving employed, the kitchen, the kitchen equipment, the food storage area and all persons employed in and around the kitchen and handling food shall meet minimum standards for restaurant health requirements. The kitchen and food services unit shall be regularly inspected by public health officials on the same basis as restaurants serving the public, and the recommendations or requirements made by the public health authorities as the result of such inspection shall be implemented by the defendants within the time allowed therefor by said public health authorities. Written policies and procedures governing dietary activity should cover a system to insure that patients receive correct prescribed diets.

6) Food shall be served at proper temperatures, fresh, and in reasonable varieties.

7) Food shall be protected from contamination and spoilage and should be distributed under safe and sanitary conditions. No food should be stored on the floor of walk-in refrigerators. The dietary service should conduct periodic acceptance studies among the patients. Disposable containers and utensils should be discarded after one use. And the hospital should develop written regulations governing smoking within the kitchen area and should make the regulations known to the dietary personnel, to the patients, and to the public.

■ 8) The denial of a nutritionally adequate diet shall not be used as a punishment.

### G. Physical Facilities.

■ 1) Patients have the right to a humane physical environment within the hospital facilities. These facilities shall be designed to make a positive contribution to the effective attainment of treatment goals of the institution.

2) All ambulatory patients shall sleep in single rooms or in multi-resident rooms of no more than six (6) persons. The number of non-ambulatory patients in a multi-resident room shall not exceed ten (10) people. There shall be allocated a minimum of eighty (80) square feet of floor space per resident in a multi-resident room. Screens or curtains shall be provided to insure privacy. Single rooms shall be equipped with toilets with seats. Each resident shall be furnished with a comfortable bed with adequate changes of linen, a closet or locker for his personal belongings to which the patient and supervisory personnel have a key, appropriate furniture such as a chair, bedside table, mirror, rugs, and bookshelves unless contraindicated by a qualified mental health professional who shall state such reasons in writing for such restrictions.

3) There shall be one (1) toilet and one (1) sink for each six (6) patients. The toilets shall be installed in separate stalls with partition and doors to insure privacy and shall be clean and free from odor, and shall be equipped with appropriate safety devices for the physically handicapped. Soap and towels and/or drying mechanisms shall be avail-

able to each sink. Toilet paper shall be available in each toilet facility.

4) There shall be one (1) tub or shower for each eight (8) patients. If a central bathing area is provided, each tub or shower shall be divided by a curtain and/or partition to insure privacy. Showers and tubs shall be equipped with adequate safety accessories.

5) The minimum dayroom shall be forty (40) square feet per patient. Dayrooms shall be attractive and adequately furnished with carpeting, curtains or drapes, reading lamps, tables, chairs, television, radio and other recreational facilities. They shall be conveniently located to the resident's bedroom and shall have outside windows. There shall be at least one (1) dayroom area for each bedroom floor in a multistory facility. Areas used for court or traffic shall not be counted as dayroom space; nor shall a chapel with fixed pews be counted as a dayroom area.

6) The minimum dining room area should be ten (10) square feet per patient. The dining room shall be separate from the kitchen and shall be furnished with comfortable chairs and tables with hard, washable surfaces.

7) The hospital shall provide adequate facilities and equipment for expeditious handling of clean and soiled bedding and other linens. There must be frequent changes of bedding and other linens, but in any event, no less than every seven (7) days, to assure sanitation and resident care. After soiling by an incontinent patient, bedding and linen must be immediately changed and removed from the living unit. Soiled linen and laundry shall be removed from the living unit daily.

8) Regular housekeeping and maintenance procedures which will insure the institution is maintained in a safe, clean and attractive condition shall be developed and implemented. There must be special facilities for non-ambulatory residents to insure their safety and comfort, including special fittings on toilets and wheelchairs. Appropriate provisions shall be made to permit non-ambulatory patients to communicate their needs to the staff.

9) Pursuant to an established routine maintenance and repair program, the physical plant shall be kept in a continuous good state of repair and operational so as to insure the health, comfort, safety and well-being of the patients, and so as not to impede in any manner the treatment programs of the patients.

10) Adequate heating and ventilation systems and equipment shall be afforded to maintain temperatures and air changes which are required for the comfort of residents at all times. Ventilation systems shall be adequate to remove steam and offensive odors or to mask such odors.

11) Thermostatically controlled hot water shall be provided in adequate quantities and maintained at the required temperature for the resident use (approximately 110° Fahrenheit at the fixture) and for mechanical dishwasher machine and laundry use (approximately 180° Fahrenheit).

12) Adequate refuse facilities shall be provided so that solid waste, rubbish and other refuse will be collected and disposed of in a manner which will prohibit transmission of disease and not create a nuisance or fire hazard or provide a breeding place for rodents and insects.

13) The physical facilities must meet all fire and safety standards established by the state and locality. In addition, the institution shall meet the provisions of the life safety code of the National Fire Prevention Association (21st edition, 1967), and standards promulgated by the Occupational Health and Safety Administration, including, but not limited to, the installation of an automatic fire detection and sprinkler system. This will include a provision that all haz-

**1212**

ardous areas should be protected by both a two-hour fire resistive construction and appropriate automatic fire extinguishing systems. Kitchen exhausts will be provided with automatic carbon dioxide or dry chemical extinguishing systems. All buildings housing patients should have an electrically · supervised, manually operated fire alarm system that transmits an alarm automatically to the local fire department. A record of safety inspection should be maintained. Such inspections should be conducted by supervisory personnel every three (3) months and recorded. Stairwells and exits should be kept clear of obstacles which would present a hazardous condition in case of fire. Such exits should be clearly indicated with appropriate signs and illuminated at night. The hospital should implement the State Fire Marshall's recommendations of August 23, 1973, without further delay.

14) There shall be provided on each unit of the hospital sufficient office space to house the necessary qualified mental health professionals, the Unit Director, psychiatrists, psychologists, social workers, registered nurse and mental health associate. Such persons shall be readily accessible to the patient population and, in turn, the patient shall be accessible to them.

### H. Implementation.

1) The Court shall appoint, within fifteen (15) days of the date of this Order a Master pursuant to Rule 53 of the Federal Rules of Civil Procedure, to oversee the implementation of the provisions of this Order and to resolve any dispute arising out of the interpretation of its meaning, effect, or language.

2) A copy of this Order shall be distributed and read by all employees of Lima State Hospital not more than five (5) days after this date and the Order shall be posted on each ward of the institution and distributed to each patient not more than five (5) days after the filing of this Order.