Joel S. FLAKES, individually and on behalf of a class, Plaintiff,

v.

Donald E. PERCY, Secretary of the State Department of Health and Social Services, and James Powell, Superintendent, Central State Hospital, Waupun, Wisconsin, Defendants.

No. 73–C–320.

United States District Court,
W. D. Wisconsin.

April 10, 1981.

**1326**

Elizabeth Alexander, Asst. State Public Defender, Madison, Wis., for plaintiff.

Robert D. Repasky, Asst. Atty. Gen., Dept. of Justice, State of Wisconsin, Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, Senior District Judge.

This is an action for declaratory and injunctive relief regarding treatment and conditions at Central State Hospital. Jurisdiction is present. 28 U.S.C. § 1343(3); 42 U.S.C. § 1983. The case has been certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiff represents all present and future patients at Central State Hospital who are confined on closed wards in cells that do not have internal sanitary facilities. Defendants are public officials with supervisory control over the hospital. Plaintiffs contend that the defendants are in violation of the eighth and fourteenth amendments to the United States Constitution by their failure to provide toilets in cells which are locked for portions of each day.

Trial has been had on the merits. Pursuant to Rule 52, F.R.Civ.P., I find as fact, as of the time of trial, those matters set forth hereinafter under the heading "Facts."

*Facts*

Central State Hospital (CSH) is a maximum security mental hospital, owned and operated by the State of Wisconsin, for the confinement of adult, male mental patients committed under five sections of the Wisconsin Statutes: (1) convicted sex offenders who have been determined in need of specialized treatment and committed pursuant to § 975.06; (2) those convicted of a crime, imprisoned, and later transferred to CSH pursuant to § 51.37; (3) those found not guilty of a crime by reason of mental disease or defect pursuant to § 971.17; (4) those found to be incompetent to stand trial pursuant to § 971.14; and (5) those civilly committed pursuant to § 51.20.

CSH is operated by the Division of Community Services within the Department of Health and Social Services. It is presently being converted from a mental health facility into a prison, and therefore shares its physical structures and certain of its facilities and staff with the Dodge Correctional Institution, which is operated by the Division of Corrections within the Department of Health and Social Services. As the Division of Corrections has assumed responsibility for portions of the building for the locked confinement of prisoners who are not mental patients, toilets and sinks have been installed in all cells so to be utilized. The earliest possible closing date for CSH is summer 1982.

The complaint in this case is directed to only four of the nine wards which continue to comprise the hospital. These are wards five, six, seven, and eight. Those four wards have no toilets or sinks in a majority of the individual cells.

Each of wards five and six has 22 cells for individual occupancy. Each of four of the cells on each of these two wards has individual toilet and sink facilities. Each of wards seven and eight has 17 cells for individual occupancy, and none of the cells has individual toilet or sink facilities. The furnishings on ward five consist of a bed and mattress; the beds in some rooms are bolted to the floor. There are no curtains on the windows. Furnishings on ward seven

include an additional locker, desk and chair. Doors in wards five, six, seven, and eight are made of solid metal with a trap opening for the insertion of food trays. The trap is closed during daytime lockup. For patients confined in cells without toilets and sinks, rubber chamber pots with lids are available for use during periods when they are locked up.

There is variety in the nature and degree of severity of the mental and emotional illnesses and disturbances among the patients at CSH, manifesting itself in varying conduct from marked passivity to frenetic activity and from submissiveness to aggressive hostility. The safety and well-being of other patients and staff require from time to time that some patients be restricted more severely than others, including confinement to their cells as contrasted with freedom to move about the ward in the company of other patients. While the mental and emotional problems of the patients create difficulties for the administrators, those problems also render many of the patients peculiarly vulnerable to insensitive and abusive treatment by administrators.

Assignments to wards at CSH generally depend upon a patient's abilities and behavior. Ward five is a receiving ward and also a ward for those who get in trouble elsewhere at CSH. Patients are divided informally into two groups, lower functioning and higher functioning. The lower functioning patients are generally housed on the wards to which this suit is directed. Ward eight houses a behavior modification program for low functioning residents.

Lockup schedules differ from ward to ward. Wards six and seven have the same schedule: patients are locked in their cells for approximately an hour at each meal time and from approximately 9:30 p. m. until 6:00 a. m. Breakfast is served at approximately 6:30 a. m., allowing people confined on those wards about one-half hour to use the toilet and to wash before breakfast. The schedule on ward eight is similar, except that it provides no opportunity for using the toilet and washing before breakfast, and patients are locked up for an additional period from 7:30 a. m. until 9:00 a. m. The schedules of patients on ward

five differ depending upon whether they have been granted "dayroom privileges." Of the 18 patients currently on the ward, approximately 14 have dayroom privileges. The other four or so are released twice a day to empty their chamber pots, just before breakfast and just after supper. The schedule provides no opportunity for these four patients to empty their pots or to wash before eating lunch and supper in their cells. Residents of ward five who have been granted dayroom privileges and wish to use them are released at about 6:00 a. m. for about 15 or 20 minutes to empty their pots and to receive medication. At approximately 9:00 a. m., they are allowed out of their cells until shortly before the noon meal at approximately 10:30 a. m. On alternating days, however, because of showering procedures, they are not allowed out in the morning. On the alternating days on which they are released from their cells from 9:00 a. m. until 10:30 a. m., patients then remain locked up until about 1:00 p. m., when they are allowed out. They remain out until the next meal, at about 3:25 p. m., when they are locked into their cells again until 6:00 p. m. cleanup. Depending upon the number of available officers, sometimes the patients are released for two or three hours at night, and sometimes they remain locked in their cells for the entire evening.

Official policy at CSH is that patients locked in cells without toilet and sink facilities are to be released promptly at any time to use the ward toilets. Patients are to obtain a guard's attention by either banging on their locked doors or calling out. Guards are then to release patients after ensuring that the proper number of guards is present on the ward. Except for ward five, the required number of guards who must ordinarily be present before a patient is released is two. For ward five, it is three. This means that at night, when fewer guards are assigned to each ward, and whenever guards are taking breaks or at meals during the day, guards responding to patients' requests must summon additional officers from other wards. When a guard is summoned from another ward, the ward

departed from is left without any officer, and is then monitored by means of a listening device.

When patients request release, they are generally released within a few minutes, but there are enough failings of the official system that nearly all patients on wards five, six, seven, and eight use the chamber pots provided in their cells. Some of the patients use the chamber pots because they do not know of the official policy that they be released to use the ward toilets. Others use the chamber pots much of the time because it is their understanding that they will be released to use the toilet only to defecate, not to urinate. Other than by word of mouth, the only provision for general distribution of the official policy to patients is by posting memoranda on the ward bulletin board. None of the patient-witnesses has ever seen such a notice on any bulletin board at CSH, although two of them have been confined there for more than four years. Some patients have heard guards say that patients are allowed out to defecate but should use the chamber pots when they must urinate. Even patients who know what the official policy is sometimes believe it is in their best interest to avoid unnecessary conflict by using the chamber pots in their cells rather than to bother guards with requests for release. One of the patients who knows of the policy is on a medication, a side effect of which is to make him unusually thirsty. He drinks several glasses of beverages each evening before going to bed and must therefore urinate during the night. He asked to be released two or three times each night until resulting conflict with a ward seven officer caused the patient to decide to use a chamber pot instead. Patients also use chamber pots when delays occur. Finally, patients use chamber pots when they are refused permission to use a ward toilet. When one of the patient witnesses, then confined in ward seven, requested that he be allowed to use the toilet just prior to a lockup, the guard believed that the patient was feigning a need and refused permission. When the patient made a motion toward the bathroom, he was pinned to the floor, then transferred to ward five, where he used the chamber pot to defecate.

Guards at CSH receive two weeks of formal training from the Division of Corrections, and only on-the-job training at CSH. CSH has difficulty attracting high quality supervisory staff, and is presently short one supervisory officer at the lieutenant level. Within the physical plant formerly used for CSH functions, therefore, five supervisory officers are responsible for both the CSH operations and the Dodge Correctional Institution operations. Policies are generally made known to guards through compilations of dated memoranda and ward policies collected and maintained within the individual wards. Some guards do not know of the policy requiring release of patients to use the toilet until patients tell them about it. The shortage of supervisory staff and the methods of communicating official CSH policies to staff and patients contribute to the lack of uniformity in the handling of requests to use the toilet.

Policy is that patients are required to empty and clean their own chamber pots on a daily basis. A policy statement written by the security director in 1975 requires that all chamber pots be washed with hot water daily and, in addition to the daily cleaning, disinfected (by some person or persons not identified) on Mondays and Thursdays. The written statement of policy further calls for reports to the security director on the fifteenth and thirtieth of each month about the general condition of all chamber pots, how many need to be replaced, and how many have been replaced.

In actual practice, the security director does not regularly receive such reports; pots are not disinfected on a regular basis on Mondays and Thursdays; and hot water for washing pots is available on only two of the four wards in question. On wards five and six, where only cold water is available for washing pots, brushes and cleanser are kept in a locked utility room. On ward seven, cleanser and brushes were made available to patients two weeks before trial in this case. There appears to be no routine

for the disinfecting of pots other than that pots are disinfected whenever a patient leaves a cell. On ward five, changes in cell assignments occur more frequently than on any other ward, generally twice a week. When a patient is confined in a cell on ward five for a longer period, officers exercise their discretion in deciding at which intervals a patient ward worker will disinfect that patient's pot. Without determining when pots have actually been disinfected, officers on ward five make notations on Mondays and Thursdays that all chamber pots have been cleaned and disinfected.

There is an odor problem on the wards where chamber pots are used. This problem is particularly intense for the patient confined in the cell, despite the cover, when the pot contains urine and feces. Strong odors are particularly frequent on ward five, where patients spend more time locked in their cells, and where disturbed patients sometimes throw the contents of their pots at the wall or at an officer. When the weather is warm and humid, the problem is intensified. Although the staff takes pains to locate promptly the source of odors and to have ward workers clean up the spilled contents of chamber pots, or whatever else may be causing the smell, the odor of urine and feces is a recurring problem.[1]

It is unusual within the institutions of the State of Wisconsin and within federal institutions in which persons are involuntarily confined, to lock persons into cells in which there are no toilets or sinks.[2]

## OPINION

Our fundamental freedom finds its source in the word "liberty" itself, as that term is used in the due process clauses of the Fifth and Fourteenth Amendments "and as informed by 'history, reason, the past course of decisions,' and the judgment and experi- ence of 'those whom the Constitution entrusted' with interpreting that word. *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 162–163, 71 S.Ct. 624, 643, 95 L.Ed. 817 (Frankfurter, J., concurring)." *Bell v. Wolfish*, 441 U.S. 520, 580, 99 S.Ct. 1861, 1895, 60 L.Ed.2d 447 (1979) (Stevens, J., dissenting). Our fundamental freedom does not find its source in statutes and regulations of state and federal governments or even in the express guarantees of the Bill of Rights. *Leis v. Flynt*, 439 U.S. 438, 456–457, 99 S.Ct. 698, 708, 58 L.Ed.2d 717 (1979) (Stevens, J., dissenting); *Meachum v. Fano*, 427 U.S. 215, 230, 96 S.Ct. 2532, 2541, 49 L.Ed.2d 451 (1976) (Stevens, J., dissenting). Despite disturbing recent implications to the contrary, this capacious and rich conception of the source of our freedom was reaffirmed clearly by the entire Court in *Bell v. Wolfish*, even as a majority embraced in the context of that case an extraordinarily pinched scope for the freedom so emanating.

However primitive and ordinary, the right to defecate and to urinate without awaiting the permission of government, and, while eating or at rest, the right to avoid the odor of one's earlier emitted feces and urine, are rights close to the core of the liberty guaranteed by the due process clause of the Fourteenth Amendment. When government undertakes to eliminate or to impair either or both of these rights, it should be required to make a strong showing of necessity for the restrictive measure. No such showing has been attempted here. Defendants contend that the Constitution of the United States restrains them only from inflicting cruel and unusual punishment, to which, in their view, the toilet arrangements at CSH do not descend. They assert no need for institutional securi-

---

1. Since trial in this matter, defendants have filed an affidavit, sworn to by Leslie Rounds, that: ward five has been turned over to the Division of Corrections, and is no longer being utilized by CSH; by approximately April 15, 1981, patients on ward six will be in a ward where cells are equipped with toilets and wash basins; and it is anticipated that patients on wards seven and eight will be in rooms with toilets and wash bowls by September, 1981.

The information provided in the affidavit has not been made the subject of factfinding. Assuming it is correct, it appears, in any event, that on at least wards six, seven, and eight, patients continue to be confined in cells without toilets.

2. This finding is made in the exercise of judicial notice.

ty, order or discipline, nor any treatment goal, to which the absence of toilets responds. They plead poverty.[3] In truth, it is the patients confined to CSH who are ridden by poverty and political impotence. They are perfect examples of victims of that "prejudice against discrete and insular minorities [that] may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *United States v. Carolene Products Co.*, 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 783, n. 4, 82 L.Ed. 1234 (1938). *See S.C. Hwy. Dept. v. Barnwell Bros.*, 303 U.S. 177, 184, n. 2, 58 S.Ct. 510, 513, n. 2, 82 L.Ed. 734 (1938).

Free of the non-interventionist strictures of the Supreme Court of the United States (*Bell v. Wolfish*, 441 U.S. 520, 547–548, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Meachum v. Fano*, 427 U.S. 215, 228–229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451, (1976); *Procunier v. Martinez*, 416 U.S. 396, 404–405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972)) and those of the Court of Appeals for this circuit made amenably to the Supreme Court's pronouncements, a district court would surely grant the injunction sought. The central question is whether those non-interventionist strictures bar judicial relief to this plaintiff class. To answer this question, a practical starting point is the Eighth Amendment's ban on cruel and unusual punishments. That ban is incorporated within the due process clause of the Fourteenth. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).[4]

## I. *The Eighth Amendment*

In *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), the Court explained that the Eighth Amendment:

... proscribes more than physically barbarous punishments ....

... ·The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...," [citation omitted] against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," [citations omitted] or which "involve the unnecessary and wanton infliction of pain," [citations omitted] ....

Surely, by any common understanding of the word, it is "cruel" to subject a person to involuntary confinement in a cell without a toilet. Also, it is unusual. However, "cruel and unusual punishments" is a term of art as it appears in the Eighth Amendment. It is a term which is difficult for courts to apply with adequate consistency. Recitation of the manner in which various courts have applied the term to various conditions of confinement is rarely helpful. I engage in it here, however, in an effort to ascertain whether there is some decent degree of recorded judicial opinion to support a finding that, when operative at all, the Eighth Amendment would forbid the conditions complained of here.

When conditions of confinement have been found to violate the Eighth Amendment, a common thread is deprivation of basic elements of hygiene. *Gates v. Collier*, 501 F.2d 1291, 1301 (5th Cir. 1974). Several courts have included in orders correcting Eighth Amendment violations a require-

---

**3.** Because this is an action for declaratory and ·injunctive relief, rather than for damages, successive incumbents of the secretaryship of the Department and the superintendency of CSH have been substituted for the original incumbents during the pendency of this lawsuit. My comments about the "defendants'" legal contentions and plea of poverty are directed not to specific present or past incumbents, but to the legislative and executive branches of state

government which have permitted the toilet arrangements in wards five, six, seven and eight of CSH to persist through the years.

**4.** Whether the Eighth Amendment, as incorporated in the due process clause of the Fourteenth, is operative as to the confinement of any or all of the five categories of patients at CSH is a question discussed hereinafter.

ment that every cell be equipped with a working toilet which flushes from the inside. *See, e. g., Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977); *Ahrens v. Thomas*, 434 F.Supp. 873 (W.D.Mo.1977); *Jones v. Wittenberg*, 440 F.Supp. 60 (N.D.Ohio 1977) (required installation of both toilets and sinks).

In *LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972), confinement in almost continuous darkness in a cell containing no sink or toilet but only a hole in the floor known as a "Chinese Toilet" was found to violate the Eighth Amendment. The court stated (at 978):

What is most offensive to this court was the use of the "Chinese toilet." Causing a man to live, eat, and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted.

In *Negron v. Preiser*, 382 F.Supp. 535, 539, n. 4, 543 (S.D.N.Y.1974), involving an institution for the criminally insane, the court indicated that it fell "below the constitutionally required minimal standards" to lock persons into cells lacking toilets and containing a "bucket" or open bedpan as a substitute.

In *Jordan v. Arnold*, 408 F.Supp. 869, 876 (M.D.Pa.1976), the court noted that prior to the commencement of the action the physical conditions of some of the cells in the United States Penitentiary at Lewisburg violated the Eighth Amendment. One of the conditions cited was that four of the cells had no sinks, while the water supply in the commodes could be controlled only from outside the cells.

In *Wolfish v. Levi*, 439 F.Supp. 114, 157 (S.D.N.Y.1977), *aff'd in part and rev'd in part on other grounds*, 573 F.2d 118 (2d Cir. 1978), *rev'd on other grounds*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the district court stated:

. . . [I]t falls today below an acceptable level of humaneness to confine a prisoner of any sex where he or she must solicit freedom to use a toilet.

The cases in which courts have considered and condemned locked cells without toilet facilities have usually involved generally barbarous conditions (of filth, vermin, cramped quarters, etc.) markedly inferior to those found in the MCC . . . . It is a small and justified step from those decisions, however, to hold unacceptable for locked confinement even an otherwise decent cell that lacks a toilet. This court so holds.

Although large parts of the district court's decision were overturned by the Supreme Court, this part was affirmed by the Court of Appeals, 573 F.2d 118, 133, n. 31 (2d Cir. 1978), and not disturbed by the Supreme Court.

In *Bel v. Hall*, 392 F.Supp. 274 (D.Mass. 1975), the court found a violation of the Eighth Amendment on the sole basis of sanitary problems in toilet access. The crucial findings regarding sanitation were the insufficiency of toilets available to inmates during daytime and the requirement that they use chamber pots while confined to cells during nighttime. The emptying of the pots was pointed to as a part of the grossly unsanitary conditions. The court stated (at 277):

Deprivation of elementary sanitary facilities automatically and without having disobeyed any of the institutional rules is not only hazardous to health but connotes an institutional disdain for the inmates which is bound to have a cumulative effect and to produce in them feelings of depression and despair.

Defendants cite several decisions in which conditions were held not to descend to the level of cruel and unusual punishment within the meaning of the Eighth Amendment, perhaps most persuasively *Ford v. Board of Managers*, 407 F.2d 937 (3d Cir. 1969). The complaint in *Ford* alleged: that in plaintiff's solitary confinement cell, there was no washbowl or running water; that no water was provided plaintiff for sanitary purposes; that he was unable to wash before eating or to maintain himself hygienically in any way; that he was not permitted to take a shower even every fifth day, as policy required; that the cell itself was not cleaned; that at all times there was a pervasive stench; that an old mattress with a

clean cover on a cement shelf was provided for bedding; and that four slices of bread and a pint of water were provided three times daily, with one "full" meal every third day. The Court of Appeals held that the complaint failed to state a claim under the Eighth Amendment. It appeared from the complaint that confinement in solitary was a disciplinary sanction. It may be that the presence or absence of an Eighth Amendment violation may turn, in some respects, upon whether the particular confinement is a sanction for a violation of institutional rules. *See Sweet v. South Carolina Dept. of Corrections*, 529 F.2d 854, 868 (4th Cir.) (1975) (Butzner, J., concurring). However, I abstain from reliance upon such a distinction. I disagree with the decision in *Ford*, without respect to whether the particular confinement is a sanction for violation of an institutional rule.

█ Plainly, in Eighth Amendment litigation there are sharp differences among judicial reactions to various conditions of confinement. But there is a mild degree of accord that deprivation of basic elements of hygiene is beyond the constitutional power of the state. I conclude that when the Eighth Amendment is operative, its ban is violated by locking a person, for any significant period of time, in a cell lacking a flush toilet and a washbowl.

Whether the Eighth Amendment is operative with respect to the confinement of persons at CSH, however, is not an easy question.

In *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), which involved the paddling of students in a public school, certiorari was granted, limited to two questions: (1) whether the paddling was prohibited by the Eighth Amendment as incorporated in the due process clause of the Fourteenth; and (2) whether the students had been afforded procedural due process with respect to the imposition of paddling as a sanction for misconduct.[5] The Court held the Eighth Amendment inoperative in the context of disciplinary

practices in public schools, stating (at 671, n. 40, 97 S.Ct. at 1412 n. 40):

> ... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.

From the context (at 664–671, 97 S.Ct. at 1408–12), it is plain that "guilt" in the language just quoted means "guilt of conduct made criminal by the state." However, the Court qualified this holding in two respects. First it asserted that public school students have "little need for the protection of the Eighth Amendment" because the openness of the public schools to public scrutiny is adequate effectively to remedy and deter excesses on the part of the teachers and administrators. *Id.* at 670, 97 S.Ct. at 1412. Second, it recognized (at 669, n. 37, 97 S.Ct. at 1411):

> Some punishments, though not labeled "criminal" by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment. Cf. *In re Gault*, 387 U.S. 1 [87 S.Ct. 1428, 18 L.Ed.2d 527] (1967). We have no occasion in this case, for example, to consider whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment.

*See also Comment, Nothing Less than the Dignity of Man: The Eighth Amendment in Mental Institutions*, 28 Am.U.L.Rev. 109 (1979).

*Bell v. Wolfish, supra*, dealt with a federal correctional center, as to which the Eighth Amendment might have been directly operative (as contrasted with its incorporation into the due process clause of the Fourteenth). However, the class of plaintiffs with whose claims the Supreme Court dealt consisted of persons who were being detained prior to trial on criminal charges, rather than persons whose confine-

---

5. Certiorari was denied on the question whether the substantive guarantees of the due process clause of the Fourteenth Amendment were violated by the paddlings. *Id.* at 659, n. 12, 97 S.Ct. at 1406.

ment had been imposed as a consequence of adjudication of guilt of crime. It was a judgment of a court of appeals which the Supreme Court reviewed. The court of appeals had relied upon the due process clause of the Fifth Amendment in holding invalid various conditions of confinement of the pretrial detainees. The record in the Supreme Court reveals that the issue was drawn by the parties in terms of the standard to be applied in the application of the due process clause, substantively, to the conditions of confinement. Plaintiffs contended in the Supreme Court that the substantive guarantees of the due process clause enjoyed by pretrial detainees could not be less generous, under any view, than the guarantees against cruel and unusual punishments enjoyed under the Eighth Amendment by persons confined as a consequence of adjudication of guilt of crime. The Supreme Court dealt with the issues exclusively under the substantive ingredient of the due process clause of the Fifth Amendment, stating (441 U.S. at 535, n. 16, 99 S.Ct. at 1872 n. 16):

> The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees. Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment. The Court recognized this distinction in Ingraham v. Wright, 430 U.S. 651, 671–72, n. 40, 97 S.Ct. 1401, 1412–13, n. 40, 51 L.Ed.2d 711 (1977) . . . .

In light of all these circumstances, a fair reading of Bell v. Wolfish is that it did not reach the questions reserved in Ingraham v. Wright (at 669, n. 37, 97 S.Ct. at 1411, n. 37): " . . . whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment." Viewing these as open questions, I consider whether the protection of the Eighth Amendment is available to any or all of the five categories of patients confined to CSH.

In Ingraham v. Wright, it was recognized that in the circumstances in which confinement in a mental institution is administered, the confinement may be sufficiently analogous to "criminal" punishments to justify application of the Eighth Amendment. 430 U.S. at 669, n. 37, 97 S.Ct. at 1411, n. 37. My findings of fact describe existence within the physical plant and subject to the daily regime at CSH. That existence (without reference for a moment to the lack of flush toilets and washbowls in some cells) is closely analogous to existence in many prisons, and much more stern and dreary than existence in many medium and light security correctional institutions. Also, with respect to each of the five categories of patients, involuntary commitment to such existence at CSH results from a process of judicial determination of mental illness and of a need for commitment and treatment[6] which is closely analogous to a judicial determination of guilt of crime and of a need for penal confinement.

There is a further and compelling consideration. In Ingraham v. Wright, as noted above, "little need for the protection of the Eighth Amendment" was found to exist for public school children. 430 U.S. at 670, 97 S.Ct. at 1412. The implication is that in less "open" institutional settings, need for that protection may exist. For CSH patients in all five categories that need is marked. Their presence in CSH is involuntary. Unlike public school students, they are physically restrained from departing at any time of day. Unlike public school students they are unlikely to " . . . [bring] with [them] the support of family and friends . . . ." Id. In Ingraham, the Court observed that while present in a public school, the students are " . . . rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment." Id. Patients at CSH are often in the presence of staff members and other patients, but, without intending any reflection upon staff members, it is doubtful, generally speaking, that staff in such hospitals will protest instances of mistreatment of pa-

6. See Part III of this opinion, below.

tients as readily as teachers will protest mistreatment of students in the public schools. By reason of their mental and emotional disabilities, fellow-patients may be limited in their powers of acute observation and, without question, less disposed to make protest than teachers and fellow-students in public schools. Most importantly, it is difficult to conceive of an institution less likely than CSH to enjoy the "openness of the public school and its supervision by the community," which were thought in *Ingraham* to "afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner." *Id.*

Because CSH patients in all five categories have marked need for the protection of the Eighth Amendment, because their involuntary confinement at CSH results from judicial determinations analogous to judicial determinations of guilt of crime, and because their existence in CSH so closely resembles existence in prisons, their confinement (exclusive of the significance of the absence of flush toilets and washbowls from some locked cells) constitutes "punishment" within the meaning of the Eighth Amendment, as that amendment is incorporated in the Fourteenth.

Superficially, two of the five categories of CSH patients appear to enjoy an added claim to the protection of the Eighth Amendment: those convicted of sex offenses and committed for specialized treatment (§ 975.06, Wis.Stats.); and those convicted of offenses other than sex offenses, sentenced to imprisonment, and then transferred to CSH because of subsequently observed mental illness (§ 51.37). As is true of the cases of persons in the other three categories (§§ 51.20, 971.14, 971.17), their cases have been the subject of judicial procedures resulting in a determination that they need to be confined for treatment in a hospital. Unlike the others, the cases of the persons in the §§ 975.06 and 51.37 categories have also been the subject of judicial procedures resulting in a determination that they are guilty of crime. Subject to the reserved questions as to persons involuntarily confined in mental and juvenile institutions, the *Ingraham v. Wright* and

*Bell v. Wolfish* proposition is that unless one has been judicially determined to be guilty of crime, one cannot be punished, constitutionally; and that unless one can be punished, constitutionally, the Eighth Amendment's protection against cruel and unusual punishments is inoperative. Under this proposition, the persons in the §§ 975.06 and 51.37 categories are clearly vulnerable to punishment, constitutionally. The point of uncertainty is whether their confinement in CSH is to be viewed as the product of the judicial determination of their guilt of crime and of the need for punishment in the form of confinement, or as the product of the subsequent judicial determination of their mental or emotional illness or disability and of the need of confinement in a hospital for treatment. Temporarily at least, the effect of the judicial determination of guilt of crime has grown severely attenuated and the effect of the judicial determination of the need for hospitalization and treatment has become dominant. I conclude, therefore, that their confinement in CSH for treatment can fairly be regarded as "punishment," for Eighth Amendment purposes, only in the same sense and to the same degree that the confinement of persons in the other three categories (§§ 51.20, 971.14, 971.17) in CSH for treatment can be regarded as punishment. However, if, for persons in the §§ 975.06 and 51.37 categories, confinement for treatment at CSH is to be construed as punishment imposed as a direct result of the judicial determination of guilt of crime, they are entitled to the protection of the Eighth Amendment on that basis, independently of any other basis.

■ I hold that persons in all five statutory categories (§§ 51.20, 971.14, 971.17, 975.06, and 51.37) confined in CSH are being subjected to punishment, within the meaning of the Eighth Amendment, and that to lock any of them, for any significant period of time, in a cell lacking a flush toilet and a washbowl is to inflict a cruel and unusual punishment in violation of the Eighth Amendment as incorporated in the Fourteenth.

## II. Due Process—Freedom from any punishment—Bell v. Wolfish

I have expressed the opinion in Part I, above, that after *Ingraham v. Wright* and *Bell v. Wolfish*, it remains an open question whether and under what circumstances the Eighth Amendment is operative with respect to involuntary confinement in mental institutions. I have expressed, then, the opinion that involuntary confinement in a particular mental institution, CSH, under the circumstances I have found to exist there, excluding the matter of the locked cells without flush toilets and washbowls, constitutes punishment within the meaning of the Eighth Amendment and renders that amendment operative. Finally, I have expressed the opinion that in the context of existence within the physical plant and subject to the daily regime at CSH, to lock a person, for any significant period of time, in a cell lacking a flush toilet and washbowl, is to inflict cruel and unusual punishment in violation of the Eighth Amendment. In that series of holdings it is implicit that, generally, involuntary confinement at CSH represents constitutionally permissible punishment, as the term "punishment" is used in the Eighth Amendment, and that it is in the deprivation of adequate toilet facilities, specifically, that the cruel and unusual punishment inheres.

Of course, it may be that my opinion is erroneous, either because the question reserved in *Ingraham v. Wright* is no longer open and has been answered to the contrary in *Bell v. Wolfish*, or because, although the question may be open, the correct answer is that unless the confinement results directly from an adjudication of guilt of crime, confinement in a mental institution, as contrasted with a prison, is not punishment within the meaning of the Eighth Amendment and, therefore, that amendment is inoperative in the circumstances. Under this view, it appears, the constitutional status of the patients at CSH is comparable to that of the pretrial detainees in the federal correctional institution in *Bell v. Wolfish*, and the due process clause of the Fourteenth Amendment, in its substantive function, protects them from subjection to any punishment. *Bell v. Wolfish*, 441 U.S. at 535–537, 99 S.Ct. at 1872.[7]

Under the *Wolfish* analysis, it appears, the imposition of a certain condition of confinement constitutes the infliction of punishment upon a pretrial detainee (and, it follows, punishment upon a patient at CSH) if the administrator has expressed an intention to punish by its imposition. Oddly, the imposition of a wholly innocuous condition would constitute punishment if the expressed intention to punish is shown. The point is of no consequence here. There is no evidence of any expressed intention on the part of either of the defendants, or any of their predecessors or any of those involved in the administration of CSH, specifically, to punish any of the patients by locking him in a cell without a flush toilet and washbowl.

Under a second branch of the *Wolfish* analysis, however, if a certain objective test is met, the imposition of a particular condition of confinement may also constitute the infliction of punishment in the absence of an expressed intention to inflict punishment by its imposition. It is not clear whether, when the objective test is met, the inference is to be drawn that the administrator tacitly intended to inflict punishment, or whether, without regard to the administrator's tacit intention, the condition of confinement, objectively weighed, constitutes punishment. Again, the point is of no consequence here. The task is to apply the objective *Wolfish* test to the confinement of patients at CSH in locked cells lacking flush

---

7. The question persists in varying ways through Parts II, III and IV of this opinion whether the constitutional status of patients of CSH in the §§ 975.06 and 51.37 categories differs from that of the patients in the other three categories. In Part I, I have decided that it does not. If it does differ, however, patients in the §§ 975.06 and 51.37 categories would enjoy protection from cruel and unusual punishment under the Eighth Amendment as incorporated in the Fourteenth, but would not enjoy protection from any punishment under the due process clause of the Fourteenth. Throughout the remainder of this opinion, I will refrain from repetition of this and similar cautions about the possible distinction.

toilets and washbowls. Although the definition of the objective test is somewhat elusive in the opinion of the Court in *Wolfish*, it appears to be whether the particular condition of confinement "is reasonably related to a legitimate governmental objective." 441 U.S., at 520, 99 S.Ct. at 1861. In making this determination, courts are bid by *Wolfish* to accord considerable deference to the judgment of the administrator. *Id.* at 547–548, 99 S.Ct. at 1878–79, and elsewhere.

However, as observed in *Beckett v. Powers*, 494 F.Supp. 364, 367 (W.D.Wis.1980, Crabb, D. J.):

> ... the language and logic of *Wolfish* require judicial deference to the judgment of prison administrators only if: (1) the practice serves the needs of the institution for security, order and discipline, *Wolfish*, 441 U.S. at 547, [99 S.Ct. at 1878] ...; (2) the practice reflects an *informed* judgment of prison administrators, *Id.*, at 547, n. 29, [99 S.Ct. at 1878] ...; and (3) the practice is not an exaggerated response to legitimate institutional needs, *Id.* at 548, 561–2 [99 S.Ct. at 1879, 1885–6] ... ." (emphasis in the text)

Neither the first nor the second condition is met here and defendants do not contend that either is met.

First, it can be inferred from the evidence that in the judgment of the administrator, locking certain patients in cells for extended portions of the day and night, serves the needs of the institution for security, order and discipline. But the absence of flush toilets and washbowls in some of those cells tends to undermine security, order, and discipline. The spilling of chamber pots, the need to move guards from one ward to another, the leaving of wards to be monitored by only an intercom system, and the potential for conflict between guards and patients caused by the need to release and to reconfine are examples. Second, the practice does *not* reflect an informed judgment of institution administrators. The testimony of staff and the memoranda submitted as exhibits indicate that the lack of toilets creates a situation which is burdensome to those who administer the institution, as well as to those who are confined in it.

The third condition for judicial deference to administrative discretion is that the practice must not be an exaggerated response to legitimate institutional needs. There is no showing that this practice is a response, exaggerated or otherwise, to any institutional need, legitimate or otherwise, if need is conceived of as a need for something to permit the institution to fulfill its mission more successfully. No doubt, in real life terms, there is a need in the sense that the demands on space at CSH prompt the use of any space, including space in locked cells without flush toilets and washbowls. But this is nothing more than an assertion of need in terms of public funds.

It is necessary to address the action of the Supreme Court in *Bell v. Wolfish* in reversing the judgment of the court of appeals on the question of double-bunking, which the court of appeals had held to violate the due process clause. 441 U.S. at 541–543, 99 S.Ct. at 1875–76. The Supreme Court did not suggest that double-bunking served the needs of the federal correctional institution for security, order and discipline. Nor did it suggest that the practice reflected an informed judgment of the administrator that double-bunking would permit the institution to fulfil its mission more successfully. Nor did it suggest that double-bunking was a response, exaggerated or otherwise, to an institutional need other than the need for space to house pretrial detainees. It is not easy, therefore, to discern why the Court refrained from deciding, under the objective branch of its analysis, that double-bunking constituted impermissible punishment of the pretrial detainees. The only conclusion one can draw is that the Court considered double-bunking in that particular correctional center to be of minimal discomfort to the detainees, emphasizing, as it did, the relatively brief night time intervals during which the detainees were locked in the cells and the relatively brief durations of their stays in the correctional center.

By contrast, as I have concluded in Part I of this opinion, to lock persons, for any significant time period, in cells without flush toilets and washbowls is to impose a hardship so severe as to constitute cruel and unusual punishment, if the Eighth Amendment is operative. I now conclude that this practice constitutes "punishment" in the sense in which certain persons are secure from punishment under the due process clause of the Fourteenth Amendment, if the *Bell v. Wolfish* analysis is appropriate to this case. In either the context of cruel and unusual punishment or the context of freedom from any punishment, as the court observed in *Palmigiano v. Garrahy*, 443 F.Supp. 956, 959 (D.R.I.1977):

> Nor can lack of funds, or invocations of the virtues of the legislative process, excuse constitutional violations or judicial default. To the contrary, the constitutional prohibition against cruel and unusual punishment, like other provisions of the Bill of Rights was designed expressly to protect the weak and powerless from the passions, or the reckless neglect, of the majority and its leaders.

III. *Due Process—Right to Treatment*

Wis.Stats. § 971.17(1) provides that a defendant found not guilty by reason of mental disease or defect shall be committed "for custody, care and treatment." Section 971.14 outlines a plan for commitment of persons found incompetent to stand trial that is clearly directed toward restoration of such persons' competency through placement in a state institution. Individuals were committed according to the provisions of the Sex Crimes Act, § 975.06, if they were "in need of specialized treatment." An individual civilly committed pursuant to § 51.20(1) must be a "proper subject for treatment." Inmates are transferred from prisons to CSH when they are deemed mentally disabled, alcoholic or drug dependent and either dangerous or "in need of psychiatric or psychological treatment." § 51.37(5)(a) and (b). Wisconsin has designated CSH as a facility to be used for the "custody, care and treatment" of persons committed or transferred there under § 51.37 and Chapters 971 and 975. § 51.37(2).

In the specific context of commitment of persons determined to be mentally disabled, the Supreme Court has said: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). *Jackson* held that persons committed as incompetent to stand trial may be confined only as long as progress toward competency is made. *Id.* Thus, courts may scrutinize such commitments to ensure that states meet the rational relation requirement. Absent treatment, no rational relation exists between one of the asserted justifications for confining people in CSH and the actual nature of that confinement.

The constitutional right to treatment for civilly committed persons has been recognized by many courts. *Wyatt v. Stickney*, 325 F.Supp. 781 (M.D.Ala.1971), *aff'd in part, rev'd and remanded in part sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974), the first case relying solely on the constitutional right to treatment, described the doctrinal basis for the right as follows: "To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." *Id.* at 785. *See also Goodman v. Parwatikar*, 570 F.2d 801 (8th Cir. 1978); *Welsch v. Likens*, 550 F.2d 1122 (8th Cir. 1977); *Burnham v. Department of Public Health*, 503 F.2d 1319 (5th Cir. 1974), *cert. denied sub nom., Department of Human Resources v. Burnham*, 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975); *Stachulak v. Coughlin*, 364 F.Supp. 686 (N.D.Ill.1973). Other courts have recognized due process and eighth amendment-based rights to protection from harm and to habilitation for mentally disabled individuals civilly confined to state institutions. *E. g., Halderman v. Pennhurst*, 446 F.Supp. 1295 (E.D. Pa.1977), *aff'd in part, rev'd and remanded in part, Halderman v. Pennhurst*, 612 F.2d 84 (3d Cir. 1979), *cert. granted*, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980); *New*

*York State Association for Retarded Children, Inc. and Parisi v. Carey*, 393 F.Supp. 715 (E.D.N.Y.1975) (consent decree approved); *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972), *aff'd in part, rev'd and remanded in part sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974). In *Weidenfeller v. Kidulis*, 380 F.Supp. 445 (E.D.Wis.1974), the court recognized a constitutional right to treatment for mentally retarded persons.

A constitutional right to treatment has been recognized for so-called "criminally committed" individuals. *E. g., Ohlinger v. Watson*, No. 78–3037 (9th Cir. 1980) reported in 28 Crim.L.Rep. 2321 (1981) (criminally confined sex offenders); *Scott v. Plante*, 532 F.2d 939 (3d Cir. 1976) (incompetent to stand trial); *Rouse v. Cameron*, 373 F.2d 451 (D.C.Cir.1966) (not guilty by reason of insanity); *Davy v. Sullivan*, 354 F.Supp. 1320 (M.D.Ala.1973) (criminally committed sex psychopath); *United States v. Walker*, 335 F.Supp. 705 (N.D.Cal.1971) (incompetent to stand trial). In *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), the Court noted that an individual committed under the Wisconsin Sex Crimes Act who argued he was confined without treatment stated a "substantial constitutional claim." 405 U.S. at 514, 92 S.Ct. at 1054.

*Davis v. Watkins*, 384 F.Supp. 1196 (N.D. Ohio 1974), applied the constitutional right to treatment to persons in Lima State Hospital, "a maximum security [facility] for the criminally insane," in which civilly committed persons, persons found incompetent to stand trial, and persons found not guilty by reason of insanity were confined. The court noted its agreement with the *Wyatt* reasoning, asserting that when the state commits an individual "until he regains his sanity," it undertakes a duty to provide care that is reasonably calculated to restore that individual. 384 F.Supp. at 1197. Most recently, in *Eckerhart v. Hensley*, 475 F.Supp. 908 (W.D.Mo.1979), conditions in the forensic unit of a state mental facility were found unconstitutional because they violated the right to treatment held by a population identical to that of CSH. The court discussed the right to treatment for

patients confined to protect society from violent behavior, and held that due process requires the state to provide treatment that will give this class of mentally ill inmates a reasonable opportunity for improvement or cure.

Courts also have applied the constitutional right to treatment in cases involving incarcerated juveniles. *Nelson v. Heyne*, 491 F.2d 352, 360 n. 13 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). *See also Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I.1972).

*O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), is the only case of which I am aware in which the Supreme Court was confronted with the constitutional right to treatment issue. The court of appeals had applied the right to a nondangerous civilly committed person. *Donaldson v. O'Connor*, 493 F.2d 507 (5th Cir. 1974). The Supreme Court held that the constitutional right to liberty prohibits the state from confining, "without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." 422 U.S. at 576, 95 S.Ct. at 2494. While the "without more" qualification presumably indicates treatment might justify confining such persons, the Court did not decide this question. "Specifically, there is no reason now to decide whether mentally ill persons dangerous to themselves or to others have a right to treatment upon compulsory confinement by the State, or whether the State may compulsorily confine a nondangerous, mentally ill individual for the purpose of treatment." 422 U.S. at 573, 95 S.Ct. at 2492.

■ The Constitution guarantees to an involuntarily confined person only the level of treatment minimally adequate to furnish that person a reasonable opportunity to be cured or to improve his or her mental condition. *Welsch v. Likens*, 373 F.Supp. 487, 499 (D.Minn.1974), *aff'd in part, vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977); *Wyatt v. Stickney*, 325 F.Supp. 781, 785 (M.D.Ala.1971), *aff'd in part, rev'd*

and remanded in part, sub nom., *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Eckerhart v. Hensley*, 475 F.Supp. 908, 915 (W.D.Mo.1979).

I am aware of the problems inherent in any judicial attempt to prescribe a treatment regimen for mentally ill individuals. *See Lake v. Cameron*, 364 F.2d 657, 663 (D.C.Cir.1966) (Burger, J., dissenting). In deciding that CSH patients may not be locked into cells lacking flush toilets and washbowls, however, I need not invade the discretionary realm of official and medical decision making. Decent living conditions must be provided to mentally ill individuals before any treatment plan can be successful. An essential element of the constitutional right to minimally adequate treatment is a humane physical and psychological environment. *Eckerhart v. Hensley*, 475 F.Supp. 905, 915 (W.D.Mo.1979); *Davis v. Watkins*, 384 F.Supp. 1196, 1206 (N.D.Ohio 1974); *Wyatt v. Stickney*, 334 F.Supp. 1341, 1343 (M.D.Ala.1971), aff'd in part, rev'd and remanded in part sub nom., *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

In giving effect to holdings that one enjoys a constitutional right to treatment, several courts have ordered facilities to remedy conditions similar to those at CSH. In *Wyatt,* the court ordered the state to install partitions between toilets in restrooms and to keep toilets "clean and free of odor." 344 F.Supp. at 382. *Davis v. Watkins* required toilets with seats in all single rooms. 384 F.Supp. at 1210. New orders recently issued in that case mandated that patients have access to a lavatory sink at all times. *Davis v. Hubbard*, 506 F.Supp. 915 (W.D.Ohio 1980), reported in 4 Ment.Disab. L.Rep. 396, 397 (1980). *Eckerhart v. Hensley* found that forty inch high partitions between toilets did not meet the privacy required for therapeutic progress. 475 F.Supp. at 917. In *New York State Association for Retarded Children, Inc. and Paresi v. Carey*, 357 F.Supp. 752 (E.D.N.Y.1973), the court ordered all nonfunctioning toilets to be immediately repaired. *Id.* at 769.

■ Whether the court orders just described are too intrusive I need not decide. Clearly, a mentally ill person forced to use either a chamber pot in the cell or to bang on a steel door until a guard appears is subjected to an environment so dehumanizing as to undercut minimally adequate treatment. I hold that the due process clause of the Fourteenth Amendment, in its substantive function, guarantees to a person involuntarily confined because of mental illness a right to minimally adequate treatment. I hold that to lock such a person, for any significant period of time, in a cell lacking a flush toilet and washbowl is to deny that right to treatment.

## IV. Due Process—Generally

Among the disturbing attributes of the opinion of the Court in *Bell v. Wolfish* is the hint that for persons who have not been convicted of crime, the due process clause of the Fifth and Fourteenth Amendments affords no protection against government other than freedom from punishment. When we close the cover on that opinion, escaping the stimulus of its relentless language, the passage of time produces its calming effect and we regain the assurance that no majority of the Court could possibly subscribe to such radical doctrine. Even to those for whom the result reached in *Ingraham v. Wright* is disagreeable, the Court's opinion is incomparably less disturbing than *Bell v. Wolfish.* But the meaning of *Ingraham v. Wright* is obscured by the Court's careful insistence that it was addressing only the issue of the Eighth Amendment as incorporated in the Fourteenth, and the issue of procedural due process under the Fourteenth, and that it was consciously not addressing the question whether the paddling of public school students violated their substantive liberty interest under the due process clause. 430 U.S. at 659, n. 12, 97 S.Ct. at 1406, n. 12.

In addressing the procedural due process question, however, the Court found it necessary to consider whether the public school student did enjoy some substantive liberty interest in not being paddled by agents of government. The answer was yes. 430 U.S. at 672–674, 97 S.Ct. at 1413–14. The interest was expressed in terms of "corporal

punishment," "bodily restraint and punishment," "hold[ing] and physically punish[ing]," and "punish[ing] . . . by restraining . . . and inflicting appreciable physical pain . . . ." *Id.* The repeated use of the word "punishment" is disconcerting in light of all the implications assigned it in both *Ingraham v. Wright* and *Bell v. Wolfish.* But we know from *Ingraham v. Wright* itself that the Court could not have used "punishment" in its Eighth Amendment sense, because that Amendment was held inoperative in the public schools. We know, too, that punishment was not used in the sense of the freedom from any punishment which *Bell v. Wolfish* tells us is absolute for those, like the public school students, not judicially determined to be guilty of crime; for such persons, any punishment is absolutely forbidden and no amount of procedural due process can pave the way to its infliction.

Therefore, in *Ingraham v. Wright,* the Court must have found a "right of personal security" (the words appear at page 673, n. 42, 97 S.Ct. at page 1413, n. 42) to reside within the "liberty" protected by the due process clause of the Fourteenth Amendment. It is such an interest that I have attempted to express in the first two paragraphs of the opinion section of this opinion and order. In my view, the baffling intricacy of the recent development of constitutional doctrine as it bears on persons involuntarily confined by government will not be dissolved until a simple proposition is accepted. The proposition is that when any person, whether or not convicted of crime, whether or not determined to be mentally ill, whether or not confined by government, challenges in the courts the constitutionality of a restraint upon his or her liberty, the court should look to that fundamental freedom the source of which lies beyond statutes and regulations and even the express guarantees of the Bill of Rights, should discern the element of individual freedom at stake, should recognize varying degrees of importance in the various elements of that freedom, should decide in light of that evaluation how mild or severe should be the requirement of justification for the particular government restraint upon the particular element of individual freedom, should allocate the burdens of going forward and of persuasion, and should proceed to trial and judgment.

In the present case, as is apparent, I would assign a high degree of importance to the element of individual freedom impaired by confinement in a locked cell without a flush toilet and washbowl, define a severe requirement of justification for the impairment, place upon the plaintiff the burden of going forward and upon the defendant the burden of persuasion, and hold, on the facts as found, that the plaintiff-class is being deprived of its substantive liberty without due process of law.

### V. *Recent Changes at CSH*

Although there has been no opportunity for fact-finding on the nature and extent of changes at CSH, counsel for the defendants represents that ward five patients have been moved to a ward (nine) completely furnished with toilets and wash basins; that by April 15, 1981, or thereabouts, the ward six patients will have been moved to a ward (ten) completely furnished with toilets and wash basins; and that although it is planned that similar arrangements for the ward seven and eight patients will occur in March, 1982, it is realistic to expect that it will occur much earlier, perhaps by September, 1981. Of course, such developments are welcome indeed. However, the regrettable delay within this court in completing the trial and adjudication of this case is exceeded only by the years upon years of procrastination on the part of the state government in putting an end to an intolerable practice. Moreover, the sworn testimony at trial in October, 1980, was that the termination of the practice was subject to several contingencies and that summer 1982 was the earliest possible date. Under these circumstances, I am unwilling to refrain from granting injunctive relief.

### Order

It is ordered: (1) that defendants' motion to dismiss, made at the close of the evidence offered by plaintiffs, is denied; and (2) that

on and after May 15, 1981, the defendants and their agents are enjoined from confining any patient in Central State Hospital in a locked cell for a period in excess of one hour unless the cell is equipped with a flush toilet and a washbowl.